UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

NICOLE HINCKLEY                                                          PLAINTIFF

V.                                                    CIVIL ACTION NO. 3:25-CV-596-DPJ-ASH

CITY OF BRANDON, MISSISSIPPI                                            DEFENDANT

ORDER

Plaintiff Nicole Hinckley challenges the City of Brandon's breed-specific ordinance banning pit bulls. Compl. [1] ¶¶ 22–23. Hinckley, who keeps two mixed-breed pit bulls as emotional-support animals, believes the City's refusal to waive its requirements for keeping pit bulls violates the Fair Housing Amendments Act (FHA). *Id.* at 16–21 (Counts I and II). She also asserts the City violated her due-process rights under the Fourth and Fourteenth Amendments. *Id.* at 22 (Count III).

After filing her Complaint, Hinckley moved for a preliminary injunction, which the City opposes. *See* Pl.'s PI Mot. [6]; Pl.'s PI Mem. [7]; Def.'s PI Resp. [19]; Pl.'s PI Reply [26]. And the City moved to dismiss the Complaint, which Hinckley opposes. *See* Def.'s Mot. [17]; Def.'s Mem. [18]; Pl.'s Resp. [22]; Pl.'s Mem. [23]; Def.'s Reply [27]. As explained below, the Court denies the motion for preliminary injunction, takes the motion to dismiss under advisement, and will set the case for a status conference.

I.      Factual Background[1]

Hinckley, who bought a home in Brandon in 2024, has two "emotional[-]support animals, an eleven-year old Labrador/Pit Bull mix named 'Ghost,' and an approximately two-year old

---

[1] The facts are mostly gleaned from Hinckley's Complaint [1] and its attachments.

English Bulldog/Pit Bull mix named 'Jackson.'" Compl. [1] ¶ 10; *see id.* ¶15 (reflecting the date Plaintiff bought her home).

Fourteen years before Hinckley moved to Brandon, the City adopted an ordinance stating: "No person shall keep any pit bull bred dog (pure-bred or any amount), within the City of Brandon." 2010 Ord. [1-1] at 2. But the ordinance provides a variance procedure. *Id.*

> A variance from the prohibition in subsection (a) may be sought by submitting a written request to the city clerk on the form approved by the city for this purpose. When seeking a variance, in addition to the written request, the applicant must have in place an approved pen/enclosure for each dog approved by the Chief of Police or his designee, and which pen/enclosure shall secure an area of not less than 100 square feet, and shall have (i) a concrete floor covering the entire enclosed area, (ii) a chain link fence, a minimum six feet in height, around the entire pen/enclosure, and (iii) a roof and/or cover over the entire pen/enclosure capable of preventing the dog from escaping. The approved pen/enclosure shall be located within a fenced in back yard.

*Id.* Once the variance request is received by the City*,* it will "consider the same and may approve the same, if all of the conditions precedent have been accomplished by the applicant, and it is determined that the granting of the same will not otherwise create a nuisance or negatively affect the quiet use and enjoyment of others in the community." *Id.*

If a variance is granted, the allowed dog(s) "shall be kept in the approved pen/enclosure" or "kept on a secure leash personally controlled by the owner or his/her designee who is able to control the dog(s) so as to not constitute a threat to the public." *Id.* at 3. A violation of the Ordinance is a misdemeanor and "the owner of the dog(s) shall be subject to a fine of up to $1,000.00 and/or punishment of up to 90 days in jail, or both. Each day a violation is determined to occur shall constitute a separate offense." *Id.*

According to Hinckley, an animal-control officer with the City visited her on March 3, 2025, and informed her that a neighbor had complained about the dogs. Compl. [1] ¶ 16. Hinckley then provided the City with a letter from her psychiatrist, attesting that the dogs are

emotional-support animals, and she explained that the FHA "trumps any municipal ordinance." *Id.* ¶ 21.  The City "insisted that even though Hinckley's emotional[-]support animals reside inside her house with her, she would still be required to comply with the City Code."  *Id.* ¶ 28 (capitalization altered).

On April 17, 2025, Hinckley completed the variance application, admitting that she did not have a "secure pen/enclosure for each dog as required by ordinance."  Application [1-6] at 3. She explained,

> Ghost and Jackson are kept indoors at all times.  They are my emotional support animals.  Erecting an outdoor enclosure for animals that will never be housed outside is unreasonable.  My yard will be fully fenced by the 60-day deadline.  It was supposed to be completed by 4/18/25.
>
> . . .
>
> I am requesting a modification based on Section 504 of the Rehabilitation Act of 1973 and the Federal Fair Housing Amendments Act of 1988.  Please refer to the 4/2/25 letter from my doctor.

*Id.* at 4.

Hinckley then allowed City of Brandon Police Chief Joesph French to inspect her property "to see if it meets the requirements for the variance."  Compl. [1] ¶ 49.  French found "two vulnerable areas [in the backyard fence] that could allow for a dog to escape . . . one of which has been partially blocked with a cattle-style barrier while the other remains open leaving a significant gap in the fence line."  Bd. Findings [1-8] at 5–6.  French also observed "a tie-out cable connected to a stake in the ground which appears to have been used previously" and noted that the "required secured enclosure . . . has not been constructed."  *Id.* at 6; *see id.* at 7 (noting tie-out "is not a secure method of restraint for pit bull breed dogs"); *id.* at 8 (finding tie-out contradicts Hinckley's "claim that the dogs are kept indoors unless walked on a leash").

After French's inspection, the Mayor and Board of Alderman considered Hinckley's variance application at a board meeting on May 5, 2025.  *Id.* at 3.

> Hinckley addressed the Board, stating that she was a responsible dog owner, she has provided proof of the homeowner's policy that covers any damage caused by the dogs, has securely fenced her backyard, and asked that she not be required to incur the unnecessary expense of constructing two outside enclosures because her emotional[-]support animals will never be kept outside.

Compl. [1] ¶ 57 (capitalization altered).  Four neighbors supported her application, *id.* ¶ 59; five "speakers spoke against" the application, *id.* ¶ 60; and the Board received "a petition in opposition" to Hinckley's application, Bd. Findings [1-8] at 6.

On June 2, 2025, the Board denied Hinckley's variance application "as premature, since the Applicant has not yet met the preliminary requirements necessary for the Board to fully consider whether to grant a variance."  Bd. Findings [1-8] at 9; *see id.* at 10 (signed June 2, 2025).  The Board found:

> Hinckley had "failed to meet the physical requirement for the keeping of pit bull breed dogs."  *Id.* at 7.

> Hinckley admitted "she does not have the required secure pen/enclosure . . . and that the dogs in question are untrained."  *Id.*

> "Allowing two pit bull breed dogs," which do not meet the variance, "would fundamentally alter the City's carefully established pit bull ordinance, which was enacted to protect public safety."  *Id.* at 8.

> Hinckley "does not provide adequate safeguards to prevent the specific dogs from escaping and potentially causing harm to persons or property."  *Id.*

> "Keeping not one but two pit bull breed dogs significantly increases the potential safety risk to the public and compounds the unreasonableness of the request.  The presence of multiple pit bull breed dogs increases concerns about containment, control, and the potential severity of any incident that might occur should the dogs escape or act aggressively."  *Id.*

> The pen/enclosure requirement "is a substantive safety measure designed to protect the public."  *Id.*

4

The Board then concluded, "To the extent the application is intended to be an accommodation request, the request is denied as unreasonable," but it added, "The City remains willing to consider any other requests made by Applicant and will continue engaging in the interactive process." *Id.* at 9. In response, Hinckley sued the City on August 11, 2025. *See* Compl. [1].

Plaintiff's motion for a preliminary injunction is fully briefed, and the Court has subject-matter jurisdiction over the dispute.

II.    Standard

Hinckley seeks a preliminary injunction enjoining the City "from taking any action to force [her] to remove her two emotional[-]support animals or penalizing her based upon their presence until [her] disability discrimination and due[-]process claims are adjudicated on their merits." Pl.'s PI Mot. [6] at 1. To prevail on her motion for a preliminary injunction, Hinckley must show

> (1) a substantial likelihood that [she] will prevail on the merits, (2) a substantial
> threat that [she] will suffer irreparable injury if the injunction is not granted,
> (3) [her] threatened injury outweighs the threatened harm to the party whom he
> seeks to enjoin, and (4) granting the preliminary injunction will not disserve the
> public interest.

*Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252–53 (5th Cir. 2009).

The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

III.     Analysis

Though Hinckley asserts both due-process and FHA claims in her Complaint, she bases her preliminary-injunction motion on the FHA.  *See* Pl.'s PI Mot. [6] at 1.  According to her, the City failed to reasonably accommodate her disability—as the FHA requires—by refusing to waive the breed-specific ordinance and denying her variance application.  Compl. [1] at 16 (Count I); *id.* at 19 (Count II).  She must show a likelihood of success on the merits to obtain a preliminary injunction.  *See Bluefield Water Ass'n*, 577 F.3d at 252–53.

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer . . . because of a handicap of . . . a person residing in . . . that dwelling."  42 U.S.C. § 3604(f)(1)(B).  Hinckley alleges "[a] refus[al] to make reasonable accommodations."  Compl. [1] at 18–19 (citing 42 U.S.C. § 3604(f)(3)(B) (defining "discrimination")).

To establish a failure-to-accommodate claim, Hinckley must show "(1) the residents of the affected dwelling or home suffer from a disability, (2) they requested an accommodation from the defendant, (3) the requested accommodation was reasonable, and (4) the requested accommodation was necessary to afford the residents equal opportunity to use and enjoy the home."  *Women's Elevated Sober Living L.L.C. v. City of Plano*, 86 F.4th 1108, 1112 (5th Cir. 2023).

The parties agree that Hinckley requested an accommodation, but they dispute the other three elements.  For this Order only, the Court assumes Hinckley has shown a likelihood of success on the disability and reasonableness elements (though the latter is more debatable).  That leaves the fourth element—necessity.  The Court will start there and then consider two other

6

arguments Hinckley offers:  (1) that the Court should defer to agency guidance and (2) that the FHA preempts the Ordinance.

A.    Necessity

The Court must begin by identifying the requested accommodation before determining whether it was necessary.  Hinckley has argued that she "should not be forced to choose between her home and the critical therapeutic support provided by her dogs."  Pl.'s PI Mot. [6] at 1.  But that's not the accommodation she requested from the City.  As the City repeatedly notes, its Ordinance allows residents to own pit bulls if they take the safety measures required to receive a variance from the Ordinance.  *See, e.g.*, Def.'s PI Resp. [19] at 1.

There is no dispute that Hinckley sought a variance without taking those measures.  *See* Application [1-6] at 3 (admitting she did not have a "secure pen/enclosure for each dog as required by ordinance").  She instead explained to the City why she thought her dogs did not require those safety precautions and "request[ed] a modification based on Section 504 of the Rehabilitation Act of 1973 and the Federal Fair Housing Amendments Act of 1988."  *Id.* at 4; *see also* Compl. [1] ¶ 57 (alleging Plaintiff "asked that she not be required to incur the unnecessary expense of constructing two outside enclosures").  Thus, the requested accommodation was to waive the variance requirements, yet Hinckley has never suggested—either during the application process or in her briefing—that she is somehow unable to accomplish those required measures.

Turning to the statutory text, Hinckley is required to prove that she was discriminated against, which includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary."  42 U.S.C. § 3604(f)(3)(B).  "To prove that an accommodation request is necessary, courts require that a

plaintiff prove that the requested accommodation makes the home either 'financially viable' or 'therapeutically meaningful.'" *Women's Elevated Sober Living*, 86 F.4th at 1112 (quoting *Bryant Woods Inn, Inc. v. Howard Cnty*, 124 F.3d 597, 605 (4th Cir. 1997)).  According to the Fifth Circuit, "[w]e must evaluate necessity considering its definition, that is, something '[i]ndispensable, requisite, essential, needful; that cannot be done without, or absolutely required.'" *Id.* (quoting *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018)).  So "a requested accommodation that is preferable to an alternative is not sufficient; it must be essential." *Id.* (citing *Cinnamon Hills Youth Crisis Ctr. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012)).

"[T]he necessity inquiry adopts a strict sense of 'necessary' and may function[] as a but-for causation requirement, tying the needed accommodation to equal housing opportunity." *Id.* at 1114 (quoting *Vorchheimer*, 903 F.3d at 110) (alteration in *Women's Elevated Sober Living*) (internal quotation marks omitted).  Put differently, "[a]n accommodation is necessary if, 'without the accommodation, the plaintiff will be denied an equal opportunity to obtain [or use, or enjoy] the housing of her choice.'" *Vorchheimer*, 903 F.3d at 110 (quoting *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006)) (alteration in *Vorchheimer*); *see also Women's Elevated Sober Living*, 86 F.4th at 1112 (noting that necessity "requires the demonstration of a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person") (quoting *Bryant Woods Inn*, 124 F.3d at 560).

Other circuits have taken the same approach.  For example, the Seventh Circuit explained in *Wisconsin Community Services, Inc.*:

> The "equal opportunity" element limits the accommodation duty so that not every rule that creates a general inconvenience or expense to the disabled needs to be

> modified.  Instead, the statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market.  We have enforced this limitation by asking whether the rule in question, if left unmodified, hurts "handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing."

465 F.3d at 749 (quoting *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (emphasis in *Hemisphere Bldg.*) (omission in *Wis. Cmty. Servs.*)).

The district court in *Henderson v. Five Properties LLC*, applied these standards to a claim like Hinckley's.  No. 24-750, 2025WL 1951763, at *5 (E.D. La. July 16, 2025) (Vance, J.) There, an apartment complex refused to waive its $400 animal fee despite plaintiff's claim that her dog Tydus was an "emotional[-]support animal."  *Id.* at *1.  The court found that the plaintiff failed to "show that her requested accommodation, [a] waiver of the animal fee, is indispensable and essential to achieve ameliorative effects of her disability."  *Id.* at *4; *see id.* at *3 (discussing necessary element and citing *Vorchheimer*, 903 F.3d at 105).  "[H]aving the animal" was not the issue in *Henderson* because the "defendants allow[ed] animals in the apartment.  The indispensable nature of the fee waiver [was] at issue."  *Id.* at *4.

So too here.  Hinckley argues that living with her emotional-support dogs "is necessary" to "ameliorate the effects of her disabilities, to have an equal opportunity to enjoy her home."  Pl.'s PI Reply [26] at 10–11.  But the Court asks if "the *requested accommodation* was necessary to afford the residents equal opportunity to use and enjoy the home."  *Women's Elevated Sober Living*, 86 F.4th at 1112 (emphasis added).  The requested accommodation was for a "modification" to the Ordinance so she wouldn't have to comply with the variance requirements.  Application [1-6] at 4 (explaining that "[e]recting an outdoor enclosure . . . is unreasonable").  Hinckley never claimed that she lacked the ability to comply.  And she has not shown that

9

exclusion from the variance requirements is necessary to attain an equal opportunity to enjoy her home.  To the contrary, she is asking to be treated more favorably than others wishing to own pit bulls within the city limits.  As a result, Hinckley fails to establish a substantial likelihood of proving the accommodation was "necessary."  *Women's Elevated Sober Living*, 86 F.4th at 1112.

B.      Deference to the Department of Housing and Urban Development (HUD)

Hinckley also urges the Court to defer to an April 25, 2013 HUD notice addressing service animals under the FHA.  Pl.'s PI Mem. [7] at 4.  Hinckley does not provide the notice, but she attaches to her Complaint a letter from Housing Education and Economic Development (HEED) to the City of Brandon apparently summarizing the 2013 HUD notice.  HEED Letter [1-2] at 2.

Hinckley places significant emphasis on this notice, citing cases that gave it deference. *See, e.g.*, Pl.'s PI Mem. [7] at 4 (citing *Chavez v. Aber*, 122 F. Supp. 3d 581, 597 (W.D. Tex. 2015)).  But because those cases were not from the Fifth Circuit Court of Appeals, they are at best persuasive authority.  And they became even less persuasive on September 17, 2025, when HUD withdrew the April 25, 2013 Notice.  *See* Notice of Withdrawal of FHEO Guidance Documents (Sept. 17, 2025), https://www.hud.gov/sites/dfiles/Main/documents/Notice-of-Withdrawal-of-Guidance-Documents.pdf.

That said, Hinckley also cites "[m]ore recent HUD guidance [that] provides '[H]ousing providers may not limit the breed or size of a dog used as a service animal or support animal just because of the size or breed[.]'"  Pl.'s PI Mem. [7] at 7 (quoting U.S. Dep't of Hous. & Urban Dev., FHEO-2020-01, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act (Jan. 28, 2020) (hereinafter FHEO-2020-01)).  The guidance instead allows "housing providers" to "limit based on specific issues with the animal's

10

conduct." *Id.* Hinckley asserts that the Ordinance violates this guidance because it treats all pit bulls the same, even those with no behavioral issues. *Id.*

Hinckley's heavy reliance on HUD guidance sparks a discussion by the parties about agency deference under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). That discussion still applies to FHEO-2020-01, even if the 2013 notice has been withdrawn.

In very general terms, *Chevron* instructed courts interpreting "statutes administered by federal agencies" to "defer to the agency's interpretation if it 'is based on a permissible construction of the statute.'" *Loper Bright*, 603 U.S. at 379–80 (quoting *Chevron*, 467 U.S. at 843)). Then, "[i]n *Loper Bright* . . . , the Supreme Court clarified 'the unremarkable, yet elemental proposition reflected in judicial practice dating back to *Marbury*' that 'courts decide legal questions by applying their own judgment,' even in agency cases." *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 391–92).

The parties agree that *Loper Bright* overruled *Chevron* but they offer different interpretations of what happens next. The City insists that "*Loper Bright* makes an independent judicial analysis mandatory." Def.'s PI Resp. [19] at 10; *see id.* ("[T]he doctrines which allowed courts to defer to agency interpretations are no longer valid."). The City also notes that any cases deferring to the HUD notices offer no guidance because they did not engage in independent judicial review. *Id.* at 11.

Hinckley has a different view. She submits that *Loper Bright* does "not call into question prior cases that relied on *Chevron* framework" and "those cases . . . are still subject to statutory stare decisis despite [the] change in interpretative methodology." Pl.'s PI Reply [26] at 7

11

(quoting *Loper Bright*, 603 U.S. at 412). She then points to a district-court case out of Pennsylvania, where "an indoor playground business denied the plaintiff entry due to his service dog." *Taylor v. K N B's Inflatables Please, LLC*, No. 4:22-CV-474, 2025 WL 608631, at *1 (M.D. Pa. Feb. 25, 2025). The court considered regulations by the United States Department of Justice in evaluating a claim under the Americans with Disabilities Act but flagged *Loper Bright*.

> The Third Circuit Court of Appeals previously deferred to these service animal regulations, i.e., the DOJ's interpretation of the ADA, pursuant to *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). *See Berardelli* [*v. Allied Servs. Inst. of Rehab. Med.*], 900 F.3d [104,] 120 [(3d. Cir. 2018)]. *Chevron* has been overruled. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). Nonetheless, cases deferring to the ADA service animal regulations are still subject to statutory stare decisis. *See id.* Accordingly, the court relies upon the analysis in *Berardelli* here.

*Id.* at *3 n.2.

"Stare decisis is the doctrine that demands adherence to judicial precedents." *Meador v. Oryx Energy Co.*, 87 F. Supp. 2d 658, 662 (E.D. Tex. 2000) (quoting *Meadows v. Chevron, U.S.A. Inc.*, 782 F. Supp. 1189, 1192 (E.D. Tex. 1991)). "[I]t applies *a fortiori* to enjoin lower courts to follow the decision of a higher court." *Hubbard v. United States*, 514 U.S. 695, 720 (1995) (Rehnquist, C.J., dissenting). So, yes, under stare decisis, the Pennsylvania district court was bound to follow the Third Circuit and defer to the subject DOJ regulations. But Hinckley has not pointed to any binding Fifth Circuit decisions which would impose stare decisis on this Court as to the HUD guidance she cites.

Looking to Hinckley's persuasive authority, she mentions three district-court cases that considered FHEO-2020-01 with respect to emotional-support animals (the rest of her cases flow from the withdrawn 2013 HUD notice). One distinguishable case discussing FHEO-2020-01 arguably favors Hinckley, the other two do not.

Starting with her best case, the court in *Bush v. Broad Management Group* denied summary judgment to a housing provider that did not allow a tenant to keep a pit bull as an emotional-support animal. No. CV 22-2746, 2023 WL 3340842 (E.D. La. May 10, 2023). As Hinckley notes, that court did rely on this quote from FHEO-2020-01: "[H]ousing providers may not limit the breed or size of a dog used as a service animal or support animal just because of the size or breed[.]" *Id.* at *3 (alteration in *Bush*). But *Bush* is readily distinguishable. First, *Bush* was decided before *Loper Bright*. Second, the opinion did not address the necessity issue. Third, the requested accommodation was different. Unlike this case, Bush asked to be exempt from a total animal ban and not requirements for a variance that would allow her to keep her dog. *Id.* at *1; *see also id.* at *5 (noting defendant had not factually supported its argument that plaintiff failed to provide temperament certification that might have allowed her to keep her dog).

Hinckley also cites *Gamane v. Laman*, to support her argument that "[p]reliminary injunctions have been issued in similar circumstances." Pl.'s PI Reply [26] at 11 (citing No. 1:22-CV-01199-JDB-JAY, 2023 WL 4397270, at *3 (W.D. Tenn. May 5, 2023), *report and recommendation adopted*, 2023 WL 4290063 (W.D. Tenn. June 30, 2023)). What Hinckley cites is a report and recommendation from a magistrate judge recommending that the district court *deny* preliminary injunction in favor of a disabled plaintiff seeking to avoid a retirement home's no-pets policy. *Id.* at *1. The district court adopted that recommendation, finding that the plaintiff had not shown a likelihood of success on the merits of the necessity element of her failure-to-accommodate claim. *Gamane v. Laman*, No. 1:22-CV-01199-JDB-JAY, 2023 WL 4290063, at *2 (W.D. Tenn. June 30, 2023). Relevant to the deference discussion, the district

court noted that the 2013 HUD notice had been withdrawn and that FHEO-2020-01 did not prohibit the pet ban. *Id.* at *7.

The most analogous case Hinckley cites is *Henderson*, *supra* at 9, but like *Gamane*, it does not support her position. Recognizing the shift from *Chevron* to *Loper Bright*, the court found that FHEO-2020-01, as well as the authorities it cites, were "entitled to respect . . . only to the extent that they have the power to persuade." *Id.* at *5 (cleaned up). But that court ultimately found FHEO-2020-01 "unpersuasive." *Id.* at *6. Finding the plaintiff's requested accommodation—waiver of a pet fee—failed "on the necessity and the reasonableness prongs," the court granted the defendant's summary-judgment motion. *Id.* This Court agrees with that analysis.

Hinckley offers no legal arguments showing that FHEO-2020-01 correctly construes the FHA's text—including the necessity element—when applied to a request to waive a city's variance requirements. FHEO-2020-01 does, however, specifically state, "As a guidance document, this document does not expand or alter housing providers' obligations under the Fair Housing Act or HUD's implementing regulations." FHEO-2020-01 at 5. It also states, "Failure to adhere to this guidance does not necessarily constitute a violation by housing providers of the FHA or regulations promulgated thereunder." *Id.* at 14; *see also id.* at 3–4 n.8 ("HUD does not intend to imply that the Joint Statement [upon which this guidance relies] is independently binding statutory or regulatory authority. HUD understands it to be subject to applicable limitations on the use of guidance.").

Hinckley has not shown that FHEO-2020-01 should be applied to these facts. Nor does it change the Court's finding that Hinckley has failed to show a substantial likelihood of success on the merits.

C.      Preemption

Assessing the preemption issue is difficult because Hinckley offers little analysis, and the parties' preemption arguments are spread across their briefing on Plaintiff's motion for preliminary injunction and Defendant's motion to dismiss.

The word "preempted" first appears in Hinckley's opening brief supporting her motion for preliminary injunction.  Pl.'s PI Mem. [7] at 4.  There, she says "[m]unicipal breed bans do not apply to emotional support animals or service animals."  *Id.* at 3.  To support that argument, she offers this quote from *Warren v. Delvista Towers Condominium Ass'n, Inc.*:  "[A]s a matter of law the Miami-Dade County ordinance [banning pit bulls] is *preempted* by the FHA in this context."  *Id.* at 4 (quoting 49 F. Supp. 3d 1082, 1089 (S.D. Fla. 2014)) (emphasis added).  Hinckley said nothing more in that brief and little more in her reply.  *See* Pl.'s PI Reply [26] at 2 n.2.

The most significant arguments on this point came in the City's reply for its motion to dismiss.  *See* Def.'s Reply [27] at 7–9.  In that brief, the City construed the *Warren* quote as possibly raising "conflict preemption."  *Id.* at 8.  "Conflict preemption applies when 'compliance with both federal and state regulations is a physical impossibility' and when the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 647 (5th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).  "For a state law to be conflict preempted, 'a high threshold must be met.'"  *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011)).

Importantly, "[p]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and

15

manifest purpose of Congress.'" *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)) (alteration in *Deanda*). And "a state law regulating health and safety falls within a state's traditional police powers." *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 748 (S.D. Miss. 2024) (citing *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 813 (5th Cir. 2011) (noting the Court should "begin with the assumption that Congress did not intend to supersede the historic police powers of the states to protect the health and safety of their citizens" (internal quotation marks and citation omitted)).

Hinckley relies on *Warren*, but the Court is not persuaded by that nonbinding and factually distinguishable case decided before *Loper Bright* and relies in part on the withdrawn regulations. 49 F. Supp. 3d at 1087 n.3. In any event, the only operative HUD guidance Hinckley cites is FHEO-2020-01. As noted above, that guidance states, "Failure to adhere to this guidance does not necessarily constitute a violation by housing providers of the FHA or regulations promulgated thereunder." FHEO-2020-01 at 14; *see also id.* at 3–4 n.8; *id.* at 5. Hinckley has not sufficiently demonstrated that the withdrawn 2013 HUD notice or FHEO-2020-01 "supersede the historic police powers." *Elam*, 635 F.3d at 813.

In sum, Hinckley was required to "clearly carr[y] the burden of persuasion on all four requirements" for a preliminary injunction. *Lake Charles Diesel, Inc.*, 328 F.3d at 196 (internal quotation mark omitted). She has not, however, demonstrated "a substantial likelihood that [she] will prevail on the merits," *id.*, because she has not shown that her requested accommodation is necessary. *See Women's Elevated Sober Living*, 86 F.4th at 1112. Thus, Plaintiff's motion for a preliminary injunction [6] is denied.

16

IV.    Conclusion

The Court has considered all arguments raised by the parties, those not addressed would not have changed the result.  For the reasons stated, Plaintiff's motion for a preliminary injunction [6] is denied.  The parties are instructed to contact Courtroom Deputy Shone Powell within three days of this Order to set the case for an expeditious status conference via Zoom.

**SO ORDERED AND ADJUDGED** this the 31st day of March, 2026.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE