**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**WASHINGTON, DC 20410-2000**

**ASSISTANT SECRETARY FOR**
**FAIR HOUSING AND EQUAL OPPORTUNITY**

**MEMORANDUM FOR:** FHEO Headquarters Staff, FHEO Office of Enforcement Staff, FHEO Regional Directors

**FROM:** Craig W. Trainor, Assistant Secretary for Fair Housing and Equal Opportunity

**DATE:** May 22, 2026

**SUBJECT:** Enforcement Guidance – Assessing Requests for the Use of an Animal as a Reasonable Accommodation Under the Fair Housing Act.

On February 19, 2025, President Trump instructed all federal agencies to review their enforcement activities and practices to ensure that they are necessary to "discharge their legal obligations, protect public safety, and advance the national interest."[1] The President further instructed agencies to "preserve their limited enforcement resources by generally de-prioritizing actions to enforce regulations that are based on anything other than the best reading of a statute."[2]

The President of the United States exercises supervisory control over the unitary executive branch, including the U.S. Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity (FHEO).[3] FHEO is committed to vigorously enforcing the civil rights of all Americans, including with respect to reasonable accommodations for disabilities under the Fair Housing Act. To execute this commitment and comply with the President's directive, FHEO must prioritize its limited enforcement resources.

Effective immediately, for complaints related to animal-related reasonable accommodations, FHEO will find reasonable cause and recommend charges only for those cases involving animals trained to provide disability-related assistance. This guidance does not address how the Department will process complaints against

[1] Exec. Order No. 14219, 90 Fed. Reg. 10583 (2025).
[2] *Id.*
[3] *See Seila Law LLC v. CFPB*, 591 U.S. 197, 203-4, 213 (2020) ("Under our Constitution, the executive Power—all of it—is vested in a President, who must take Care that the Laws be faithfully executed. Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance . . . . As Madison explained, if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.") (cleaned up).

housing providers under Section 504 of the Rehabilitation Act or the Americans with Disabilities Act (ADA).

**Animal-related Reasonable Accommodations**

The Fair Housing Act prohibits discrimination "against any person . . . in the provision of services or facilities in connection with [his or her] dwelling, because of a handicap."[4] Unlawful discrimination can include "a *refusal* to make *reasonable* accommodations in the rules, policies, practices, or services, when such accommodation may be *necessary* to afford such person *equal opportunity* to use and enjoy a dwelling."[5] The Department's accompanying regulation makes clear that waiving a no-pets policy to allow a blind person to live in an apartment with his seeing eye dog—a trained service animal—is a required reasonable accommodation.[6]

To help housing providers assess a person's request to have an animal as a reasonable accommodation, FHEO issued guidance on January 28, 2020. Citing to a regulation of pet ownership in public housing, the guidance emphatically declared that animals providing "emotional support"—as well as trained service animals—"are *not pets*."[7] Thus, the notice explained that pet fees could not be assessed for untrained emotional support animals (ESAs).[8] It further purported to delineate "the type and amount of documentation" a housing provider "may ask" for to (1) show a disability, and (2) support an accommodation request for an ESA.[9]

Six years after this guidance issued, it remains an immense challenge to determine whether an animal-related reasonable accommodation should be granted or denied. Though well intentioned, the guidance failed to provide "greater clarity" on the supposed distinction between pets and emotional support animals.[10] Instead, an entire industry has emerged to convert pets into emotional support animals.[11] And housing providers that deny a request to waive pet policies for untrained ESAs or ask

---

[4] 42 U.S.C. §3604(f)(2).
[5] *Id*. at 3604(f)(3)(B) (emphasis added).
[6] 24 C.F.R. § 100.204(b).
[7] FHEO Notice: FHEO-2020-01, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, 3 (Jan. 28, 2020). *But see Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (The Act "requires that an accommodation be essential to achieve equal housing opportunity, measured against any alternatives that were offered.").
[8] FHEO Notice: FHEO-2020-01, at 3.
[9] *Id*. at 1.
[10] *See, e.g.,* Christian Britschgi, *How the Fair Housing Act Gave Us Emotional Support Parrots*, REASON, Mar. 2025, https://reason.com/2025/02/02/you-cant-evict-polly/ (examining the absurdity and confusion that has arisen by the lack of clear standards related to animal-related reasonable accommodation requests).
[11] *E.g.*, @myemotionalsupportanimal, *Get Approved for Free Today*, Facebook (Apr. 18, 2026, 12:26 PM), https://www.facebook.com/myemotionalsupportanimal/videos/get-approved-for-free-today/1120162697840187/ [https://perma.cc/WY3E-KACX]; Pettable, GET YOUR ESA LETTER IN 24 HOURS, https://pettable.com/ [https://perma.cc/2SAH-NEX3] (last visited May 22, 2026).

reasonable follow-up questions risk a fair housing complaint and a prolonged investigation—despite compliance with HUD guidance. (Appendix A).[12]

Moreover, although framed as nonbinding best practices, the guidance had the effect of imposing categorical fair housing obligations on housing providers without comporting with the notice and comment requirements of the Administrative Procedure Act.[13] This is reason alone to rescind the guidance.

**Prior Regulations, Guidance, and Case Law**

As previously stated, the only example of an animal-related reasonable accommodation provided in the Department's regulations is permitting use of a dog trained to provide a disability-related service.[14] Over time, the requirement to waive "no pets" policies for trained service animals expanded into a general injunction against rules or conditions on untrained emotional support animals.

This evolution began in 2008, when the Department narrowed the definition of pets within public housing to exclude assistance or support animals.[15] The rule exempted "animals that are used to *assist*, *support*, or provide service to persons with disabilities" from limitations on pet ownership in HUD-assisted public housing.[16] The Department did not purport to impose its public housing pet rules on private owners and operators nationwide.[17]

Nonetheless, some courts deferred to the Department's public housing rule and applied its reasoning to private housing providers.[18] Relying on one such federal district court opinion, the U.S. Department of Justice opined that "emotional support animals that do not qualify as service animals under the [ADA] regulations may

[12] Attached is an appendix with one federal district court opinion that found FHEO's 2020 notice unpersuasive and two examples of meritless cases involving multiple emotional support animals that FHEO recently dismissed.
[13] *Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 97 (2015) (explaining interpretive rules issued without notice and comment lack the force of law in the adjudicatory process).
[14] 24 C.F.R. § 100.204. *See also* 24 C.F.R. § 8.11.
[15] Pet Ownership for the Elderly and Persons With Disabilities, 73 Fed. Reg. 63834-01 (Oct. 27, 2008); 24 CFR § 5.303.
[16] 24 CFR § 5.303 (emphasis added).
[17] The pet policy that the Department chooses to impose on public housing providers is not necessarily appropriate for private landlords or property managers, especially those with small portfolios.
[18] *Warren v. Delvista Towers Condo. Ass'n, Inc.*, 49 F. Supp. 3d. 1082, 1087 (S.D. Fla. 2014) ("In light of the HUD rule, it is of no moment whether Amir [an emotional support dog] is specially trained."); *Overlook Mutual Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 860 (S.D. Ohio 2009) (observing that HUD's rule applies "only to HUD-assisted public housing, as opposed [to] applying to housing generally," but finding that rationale of the rule supported extending it to all housing).

nevertheless qualify as permitted reasonable accommodations for persons with disabilities under the" Fair Housing Act.[19]

In 2013, the Department issued subregulatory guidance pronouncing that "any assistance animal"—trained or untrained—must generally be admitted into dwellings and their common use areas, without restrictions or pet fees, as a reasonable accommodation.[20] Other courts then deferred to this more robust guidance when adjudicating "emotional support animal" reasonable accommodation claims.[21] Although the most recent 2020 notice replaced the 2013 notice, it reinforced its general rules.

Thus, through judicial deference to nonbinding agency interpretations, the legal standards for animal-related "reasonable accommodations" under the Fair Housing Act came to dramatically diverge from those required under the ADA. No housing provider had an opportunity to provide comment.[22] And now, over 20% of FHEO's fair housing complaints revolve around untrained ESAs. This cannot continue.

**New Enforcement Standard and Prioritization**

In a recent Fair Housing Act case, a federal court rejected a person's reasonable accommodation claim regarding her emotional support animal.[23] When the plaintiff invoked FHEO's January 28, 2020, guidance in support for her position, the Court found simply: "HUD's Notice is unpersuasive."[24] Having carefully reviewed that guidance, I agree. As a result, I am permanently rescinding FHEO's 2020 notice regarding assistance animals.[25]

---

[19] Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56236, 56240 (Sept. 15, 2010) (citing *Overlook Mutual Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850 (S.D. Ohio 2009)).

[20] FHEO-2013-01, Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs (Apr. 25, 2013).

[21] *E.g.*, *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 807 (E.D. Cal. 2016) ("The Court grants HUD's notice considerable and substantial deference."); *Bone v. Village Club, Inc.*, 223 F. Supp. 3d 1203, 1214 (M.D. Fla. 2016); *Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1185-86 (D. Colo. 2016); *Chavez v. Aber*, 122 F. Supp. 3d 581, 597 n.7 (W.D. Tx. 2015); *Comm'n on Human Rights and Opportunities v. The Mansions, LLC*, 231 Conn. App. 121, 144-46 (App. Ct. of Conn. 2025), *rev'd*, SC 21111, 2026 WL 827929.

[22] The Administrative Procedure Act's notice and comment provision is designed "'to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is likely to give real consideration to alternative ideas.'" *National Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1148 (D.C. Cir. 2013) (quoting *New Jersey, Dep't of Environmental Protection v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980)).

[23] *Henderson v. Five Properties LLC*, No. 24-750, 2025 WL 1951763, at *5 (E.D. La. July 16, 2025).

[24] *Id.*

[25] FHEO's 2020 notice built upon the errors contained in the 2013 notice related to assistance animals. Both notices were rescinded on September 17, 2025. This memorandum reconfirms those recissions and provides further guidance on this topic.

In the absence of HUD regulations defining animal-related reasonable accommodations, the regulations for service animals under Titles II and III of the ADA are instructive. Under the ADA, a service animal "is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability."[26] To be a service animal, the tasks performed by the animal "must be directly related" to the disability.[27] Common examples of disability-related tasks include "assisting individuals who are blind or have low vision with navigation," "alerting individuals who are deaf or hard of hearing to the presence of people or sounds," "assisting an individual during a seizure," "retrieving items," "providing physical support and assistance with balance and stability," and "helping persons with psychiatric and neurological disabilities."[28] But "the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition."[29]

Going forward, FHEO will use the training component of the ADA's definition for service animals to assess animal-related reasonable accommodation complaints under the Fair Housing Act.[30] Applying similar reasonable accommodation standards between the Fair Housing Act and Titles II and III of the ADA will provide improved clarity and predictability for tenants and housing providers alike. As a corollary, defining an assistance animal as an animal *trained to assist with a disability* is the best guarantee of evenhanded enforcement of the Fair Housing Act.

In light of these standards, FHEO will find reasonable cause for failure to provide a reasonable accommodation involving the waiver of a pet policy only where the animal has been individually trained to perform work or perform tasks directly related to the complainant's disability.

While requests to waive pet policies for animals trained to perform specific disability-related services are presumptively reasonable, requests to waive pet policies for untrained ESAs are not.[31] FHEO no longer expects housing providers to categorically extend accommodations for trained assistance animals to untrained ESAs. By prioritizing the most meritorious cases involving trained assistance animals, FHEO can responsibly utilize its enforcement discretion[32] to deploy enforcement resources

---

[26] 28 C.F.R. §§ 35.104, 36.104.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] Unlike Titles II and III of the ADA, an animal-related reasonable accommodation under the Fair Housing Act could involve a species other than a dog, provided the animal is trained to perform a disability-related service.
[31] *See Revock v. Cowpet Bay West Condo. Ass'n*, 853 F.3d 96, 110 (3d Cir. 2017) ("In emotional support animal cases, a housing provider may contest whether the accommodation is reasonable.").
[32] *United States v. Texas*, 599 U.S. 670, 685 (2023) (holding that Article III courts cannot "order the Executive Branch to take enforcement actions against violators of federal law"); *see Citizens for Resp.*

consistent with the best reading of the law.[33]

Given this posture, Regional Directors must send all open emotional support animal cases to Acting Deputy Assistant Secretary for Enforcement and Programs Robert A. Doles for a case-by-case determination on the merits.

Notwithstanding the Department's enforcement determination in a given case, the Fair Housing Act provides that a complainant may file a civil action in an appropriate federal district court or state court within two years after the occurrence or termination of the alleged discriminatory housing practice.[34] Nothing in this enforcement guidance affects the rights of parties to seek redress through a private action in court.

**Future Rulemaking**

The language and definitions in the ADA regulations have changed over time, but HUD's regulations for animal-related reasonable accommodations by private housing providers have not been updated in 35 years.[35] The Department intends to engage in notice and comment rulemaking regarding animal-related reasonable accommodations, with the aim of harmonizing our regulations, to the maximum extent possible, with those of the ADA.

Whether a particular accommodation is reasonable under the circumstances is the type of fact-intensive, case-specific determination that would benefit from notice and comment rulemaking. With public input from private as well as public housing providers, the Department will be better positioned to develop a sound approach to case-by-case determinations.[36] Although a "case-by-case determination" inherently implies individual assessment, regulations can be designed and implemented to streamline and simplify determinations while balancing the interests of housing providers and disabled Americans.

---

*& Ethics in Wash. v. FEC*, 993 F.3d 880, 887-88 (D.C. Cir. 2021) ("The general principle that an agency's exercise of enforcement discretion is unreviewable follows from tradition, case law, and sound reasoning as well as protection for a core executive power. The vesting of all executive power in the President as well as his constitutional obligation 'to take Care that the Laws be faithfully executed' has been understood to leave enforcement and nonenforcement decisions exclusively with the Executive Branch.") (cleaned up).

[33] Exec. Order No. 14219, 90 Fed. Reg. 10583 (2025).

[34] 42 U.S.C. 3613(a)(1)(A).

[35] Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3289 (Jan. 23, 1989); 24 C.F.R. § 100.204(b).

[36] *See United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009) ("The primary purpose of Congress in imposing notice and comment requirements for rulemaking is to get public input so as to get the wisest rules.") (cleaned up).

# Appendix

This appendix includes reference materials that either inform or reflect the Department's current approach to animal-related reasonable accommodation requests under the Fair Housing Act.

**Exhibit A** is a recent federal district court decision, *Henderson v. Five Properties LLC*, No. 24-750, 2025 WL 1951763, at *1 (E.D. La. July 16, 2025), that declined to follow the rules announced in the now-rescinded FHEO notices on emotional support animals. In July 2025, the court held that waiver of a generally-applicable pet fee for an emotional support animal was neither reasonable nor necessary, which are required elements of a reasonable accommodation claim.

**Exhibit B** is a no reasonable cause determination (NRC) that dismissed a complaint involving three emotional support animals supported by an online form letter. Filed in February 2024, the matter led to a preliminary conciliation agreement that would have required the respondents to obtain fair housing training and amend their pet policies. The investigative file, however, warranted an NRC, which FHEO issued in April 2026.

**Exhibit C** is another NRC that dismissed a complaint involving dozens of animals of different species that were claimed as emotional support animals. Filed in March 2024, the case had not been resolved as of March 2026. FHEO issued the NRC in April 2026.

# Exhibit A

2025 WL 1951763
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Michaela HENDERSON
v.
FIVE PROPERTIES LLC and Suzanne Tonti

CIVIL ACTION NO. 24-750
|
Signed July 16, 2025

**Attorneys and Law Firms**

Ameca Alexis Reali, M. Lucia Blacksher Ranier, Molly Gordon, Louisiana Fair Housing Action Center, New Orleans, LA, Myles Drew Ranier, Broussard Injury Lawyers, Lake Charles, LA, for Michaela Henderson.

Elizabeth A. Roussel, Luke Gerard LaHaye, Adams and Reese, LLP, New Orleans, LA, for Five Properties LLC and Suzanne Tonti.

SECTION "R" (4)

**ORDER AND REASONS**

SARAH S. VANCE, UNITED STATES DISTRICT JUDGE

***1** Defendants Five Properties, LLC, Suzanne Tonti, and APMT Management Services, LLC move for summary judgment dismissing plaintiff Michaela Henderson's reasonable accommodation claim under the Fair Housing Act and the Louisiana Equal Housing Opportunity Act. [1] Defendants also move for summary judgment on their breach of contract claims against plaintiff. [2] Plaintiff opposes the motion. [3] For the following reasons, the Court grants defendants' motions for summary judgment on plaintiff's reasonable accommodation claim, and dismisses the remaining state-law claims without prejudice.

## I. BACKGROUND

The Court has reviewed the record and determined the facts are as follows. In July 2022, plaintiff Michaela Henderson applied to lease an apartment at AlmondTree Apartments in Harahan, Louisiana, which is owned by Five Properties and managed by Suzanne Tonti and APMT Management Services, LLC. [4] In the application, Henderson stated that she had a dog named Tydus. [5] Henderson entered a lease to live at Almondtree Apartments through November 30, 2023, and paid a nonrefundable animal fee of $350. [6]

In November 2023, Henderson inquired about moving into another one of Five Properties' apartment complexes managed by defendants, Sunlake Apartments. [7] As part of the application, Henderson requested that the nonrefundable $400 animal fee be waived because of Tydus's emotional support animal ("ESA") status. [8] In support of this request, Henderson noted in her application that Tydus keeps her calm and stable, that he has documentation, and that she is getting more documentation in December. [9] On December 26, 2023, Henderson submitted a letter from Steph Lee, an advance practice registered nurse ("APRN"), who stated that Henderson meets the federal criteria to request a reasonable accommodation of being accompanied

by her ESA.[10] Specifically, Lee found that Henderson has a mental/emotional condition recognized in the Diagnostic and Statistical Manual of Mental Disorders that caused disability as defined by the Americans with Disabilities Act, and that Henderson needs to have her ESA accompany her to provide relief from symptoms from her mental/emotional disability.[11]

Shortly after receiving the letter, Tonti notified Henderson that Tydus could live with her if she paid the nonrefundable animal fee, but she had not provided sufficient information to demonstrate she could not enjoy the use of the apartment without a waiver of the animal fee.[12] Tonti noted that the records Henderson provided indicated that she had sufficient income to pay the fee.[13]

***2** An attorney for Tonti Management sent Henderson a letter on January 4, 2024, communicating Tonti Management's denial of the $400 animal fee waiver.[14] He noted that the Lee letter did not provide sufficient reliable information that Henderson is disabled or that there is a nexus between the supposed disability and the dog such that the animal is required.[15] Further, he stated that there is no indication that Henderson cannot equally use and enjoy the apartment without waiver of the fee because her financial information indicates she has adequate income to pay the $400 fee.[16] On January 9, 2024, Henderson canceled her Sunlake Apartments application.[17] On March 25, 2024, Henderson filed suit under the Fair Housing Amendments Act ("FHAA"), and the Louisiana Equal Housing Opportunity Act seeking a declaratory judgment, a permanent injunction, and general, specific, and punitive damages.[18] In defendants' answer, they made a counterclaim against plaintiff for breach of contract arising out of alleged unpaid rent and damages caused by plaintiff's dog.[19]

Defendants now move for summary judgment on plaintiff's reasonable accommodations claims, asserted under 42 U.S.C. § 3604(f)(3)(b) and La. Rev. Stat. § 51:2606(A)(6)(a)(ii).[20] Additionally, defendants move for summary judgment on their breach of contract claim.[21]

The Court considers the motion below.

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075 (noting that the moving party's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence" (citations omitted)). "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party must put forth evidence that would "entitle it to a [judgment as a matter of law] if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991) (internal quotation marks omitted)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Plaintiff's Claims

***3** Under the Fair Housing Amendments Act ("FHAA") and the Louisiana Equal Housing Opportunity Act ("LEHOA"), it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a" disability of "a person residing in or intending to reside in that dwelling." 42 U.S.C. § 3604(f)(1)(B); La. Rev. Stat. § 51:2606(A)(6)(a)(ii). In both statutes, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); La. Rev. Stat. § 51:2606(A)(6)(c)(ii). When, as here, the applicable LEHOA provisions mirror those in the FHAA, courts in the Fifth Circuit apply the same analysis to both claims. *See Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 364 F. Supp.3d 635, 648 n.90 (E.D. La. 2019) ("Because the language in the relevant sections of the FHA and Louisiana Equal Housing Opportunity Act are nearly identical, the Court's analysis of plaintiff's FHA claims applies with equal force to its claims under the state statute."); *Pecan Acres Ltd. P'ship I v. City of Lake Charles*, 54 F. App'x 592, *1 (5th Cir. 2002) (holding that for the same reasons plaintiff failed to prove a violation of the FHAA, plaintiff also failed to prove a violation of the LEHOA); *Edwards v. St. John Baptist Par.*, 2010 WL 3720436, at *5 n.2 (E.D. La. Sept. 9, 2010) (same); *Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 2019 WL 9903799, at *2 n.11 (E.D. La. Oct. 23, 2019) (applying the same analysis when the plaintiff's "claims under the Louisiana Equal Housing Opportunity Act ... has provisions mirroring the Fair Housing Act"); *Osborne v. Belton*, 2022 WL 3093765, at *6 (W.D. La. Aug. 3, 2022) (same).

The plaintiff bears the burden of proving a violation. *Women's Elevated Sober Living L.L.C. v. City of Plano, Texas*, 86 F.4th 1108, 1112 (5th Cir. 2023) (citing *Elderhaven, Inc. v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir. 1996)). In a failure-to-accommodate claim, a plaintiff must demonstrate that (1) the residents of the affected dwelling or home suffer from a disability, (2) they requested an accommodation from the defendant, (3) the requested accommodation was reasonable, and (4) the requested accommodation was necessary to afford the residents equal opportunity to use and enjoy the home. *Id.* (citing *Providence Behav. Health v. Grant Rd. Pub. Util. Dist.*, 902 F.3d 448, 459 (5th Cir. 2018)).

A generally applicable fee, like the one at issue here, is not *per se* valid simply because it is generally applicable. "[T]o exempt generally applicable fee rules from scrutiny under the FHAA would permit landlords to circumvent the Act's requirements simply by imposing fees for certain matters, rather than by imposing flat bans or other types of restrictive rules." *United States v. California Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1417 (9th Cir. 1994) ("*California Mobile Home Park Mgmt. Co. I*"). Generally applicable fees may, but do not automatically, unfairly burden disabled tenants. *Id.* ("There are, of course, many types of residential fees that affect handicapped and non-handicapped residents equally; such fees are clearly proper. Fees that merit closer scrutiny are those with unequal impact, imposed in return for permission to engage in conduct that, under the FHAA, a landlord is required to permit."). The inquiry to determine if the generally applicable fee does so is "highly fact-specific, requiring case-by-case determination." *Id.* at 1418. The analysis also requires the court to balance the needs of the parties. *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002).

To prove that an accommodation is necessary, the fourth element, courts require that the plaintiff prove the requested accommodation makes the home therapeutically meaningful or financially viable. *Women's Elevated Sober Living L.L.C.*, 86

F.4th at 1112 (citing *Bryant Woods Inn v. Howard County*, 124 F.3d 597, 605 (4th Cir. 1997)). Courts consider necessity "(1) in light of the statutory provision's language; (2) in accord with the purpose of the FHA and ADA, to ameliorate the plaintiff's particular disability; and (3) in the light of 'proposed alternatives.' " *Id.* at 1112 (citing *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018)). But a preferable accommodation or alternative is not sufficient—it must be essential. To be therapeutically necessary, an accommodation be "[i]ndispensable, requisite, essential, needful; that cannot be done without, or absolutely required." *Id.* (citing *Vorchheimer*, 903 F.3d at 105). The accommodation must be so necessary and so closely linked to the individual's disability that "without the requested accommodation, the ameliorative benefit provided [would] be so insignificant that it deprives persons with disabilities from the opportunity to use and enjoy the dwelling of their choice as compared to those without disabilities." *Id.* "A requested accommodation is necessary only if the plaintiff shows that without the requested accommodation, they will receive no ameliorative effect from their disability, thereby depriving them of the equal opportunity to enjoy the dwelling." *Id.* at 1113.

***4** Therefore, to succeed on this prong, plaintiff must show that her requested accommodation, the waiver of the animal fee, is indispensable and essential to achieve ameliorative effects of her disability. Plaintiff fails to do so. Plaintiff puts forward no evidence to demonstrate that waiving the fee would alleviate any effects of her disability. The letter from Lee adequately establishes that Henderson has a recognized disability and that her pet provides relief from symptoms from that disability. But her having the animal is not at issue; defendants allow animals in the apartment. The indispensable nature of the fee waiver is at issue. The evidence in the record establishes that a proposed alternative, a payment plan for the animal fee, would have been effective. Defendants offered twice to establish a payment plan so that plaintiff could afford the fee. [22] And plaintiff stated that she could have paid the fee had it been broken out into installments. [23] Thus, plaintiff has not established that a waiver of the fee is necessary to afford her equal opportunity to use and enjoy the dwelling.

Regarding the third element, the reasonableness element, the burden is again on the plaintiff to show that the requested accommodation is reasonable. *See Elderhaven, Inc. v. City of Lubbock, Tex.*, 98 F.3d 175, 178 (5th Cir. 1996) (holding that a plaintiff, and not a defendant, bears the burden of proof on the question of reasonableness). When considering the reasonableness of a generally applicable fee, a court should consider factors such as "the amount of fees imposed, the relationship between the amount of fees and the overall housing cost, the proportion of other tenants paying such fees, the importance of the fees to the landlord's overall revenues, and the importance of the fee waiver to the handicapped tenant." *California Mobile Home Park Mgmt. Co. I*, 29 F.3d at 1417; *see also United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1381 (9th Cir. 1997) ("*California Mobile Home Park Mgmt. Co. II*") ("Each of the factors we discussed [in *California Mobile Home Park Mgmt. Co. I*] is relevant to the balancing of interests inherent in any 'reasonableness' determination.").

The Court finds that plaintiff failed to demonstrate a genuine issue of material fact on the issue of reasonableness. Turning to the factors outlined above, the animal fee imposed was a one-time payment of $400. [24] The overall housing cost was $910 a month for a term of fifteen months. [25] That makes the fee a little under three percent of the total cost of housing. Though plaintiff provided evidence of defendants' current assets and how much defendants have collected in security deposits, [26] plaintiff did not provide any information about the importance, or lack thereof, of the *animal fee* to the landlord's overall revenue. Plaintiff provided no evidence on the number of other tenants paying the fee, and plaintiff submitted no evidence that the fee has an unequal impact on or was designed to wrongly target handicapped individuals. Animal fees are relatively typical for leased apartment buildings in which animals are allowed.

Additionally, plaintiff failed to establish the importance of the fee waiver to her. While being able to have an ESA may be a reasonable accommodation, *see, e.g.*, *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014), permission to have an ESA is not at issue here, because defendants' apartment complex allows for plaintiff to have an animal with a fee. The requested accommodation is the waiver of the animal fee, and plaintiff must demonstrate the importance of the fee waiver. While she maintains that she had some financial difficulties, plaintiff stated that she could have afforded the animal fee. [27] Specifically, defendants offered plaintiff a payment plan, where she did not have to pay the entirety of the fee all at once. Plaintiff stated that she could have made incremental payments and been able to afford the fee over time. [28]

***5** Based on a fact-specific inquiry of the generally applicable fee at issue and the highlighted factors, the Court holds that plaintiff also failed to create a genuine issue of material fact as to the reasonableness of the animal fee waiver.

Plaintiff relies on agency interpretations of the FHAA to demonstrate that the request was necessary and reasonable, but these agency interpretations do not change the Court's analysis. Plaintiff relies on the U.S. Department of Housing and Urban Development's ("HUD") Notice on Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act. [29] The United States Supreme Court has clarified that it is the role of the courts, not agencies, to "interpret constitutional and statutory provisions." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024) (quoting 5 U.S.C. § 706); *Van Loon v. United States Dep't of the Treasury*, 122 F.4th 549, 562 (5th Cir. 2024) (holding that the Supreme Court overruled *Chevron* and "eliminated the 'judicial invention' of deference to administrative action and rulemaking"). Therefore, plaintiff's cited agency interpretation—which was not derived from formal adjudication or notice-and-comment rulemaking—are " 'entitled to respect,' under [*Skidmore*] only to the extent that [they] have the 'power to persuade.' " *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 n.3 (6th Cir. 2011) (clarifying that the Joint Statement, discussed below, is a policy statement that warrants *Skidmore* deference, not an authoritative interpretation of the statute). As a result, the weight of the agency's interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

HUD's Notice is unpersuasive. The Notice provides that a housing provider may not charge a fee or deposit for service animals or other assistance animals, even though it may do so for other pets in its discretion. U.S. Dep't Hous. & Urb. Dev., FHEO Notice: FHEO-2020-01, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act 3, 3 n.8, 14 (Jan. 28, 2020) [hereinafter "Notice"]. This Notice suggests that fees are disfavored in every instance, regardless of how reasonable or proportional the fee may be or of the circumstances of the person with a disability. The authorities it cites to in support of this assertion are unconvincing. The first cited authority is the HUD and the U.S. Department of Justice's ("DOJ") Joint Statement on Reasonable Accommodations Under the Fair Housing Act. This Joint Statement provides that "[h]ousing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation," and it provides two examples of such behavior. U.S. Dep't of Hous. & Urb. Dev. & U.S. Dep't of Just., Joint Statement on the Reasonable Accommodations Under the Fair Housing Act 9–10 (May 17, 2004) [hereinafter "Joint Statement"]. Though the Joint Statement was issued fourteen years ago and is consistent with the Notice, which factor positively under the *Skidmore* analysis, the Joint Statement does not provide thorough reasoning in its interpretation or offer any explanation or authorities for its cursory statement regarding the payment of fees. Additionally, HUD stated that it "does not intend to imply that the Joint Statement is independently binding statutory or regulatory authority. HUD understands it to be subject to applicable limitations on the use of guidance." Notice at 4 n.8. The Joint Statement is unpersuasive under *Skidmore* because its consideration is not thorough, and it presents no reasoning to evaluate. *Cf. Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 111 (3d Cir. 2018) (finding the Joint Statement unpersuasive on a different point, because of its lack of thorough reasoning).

***6** The Notice also cites two cases that quote the Joint Statement in their opinions, in support of the proposition that the Joint Statement is persuasive to courts: *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277 (11th Cir. 2014), and *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp.2d 307 (E.D.N.Y. 2012). Neither of these cases quotes the portions of the Joint Statement relating to animal fees or even deals with an animal fee. *See Bhogaita*, 765 F.3d at 1286, 1287; *see also Sinisgallo*, 865 F. Supp. 2d at 315, 321, 336, 338. Both are unpersuasive in establishing the point at issue. Just because the Joint Statement or Notice may be convincing on other topics does not make the entire document influential. The final case the Notice cites in support of its animal fees assertion is *Fair Hous. of the Dakotas, Inc. v. Goldmark Prop. Mgmt.*, 778 F. Supp.2d 1028 (D. N.D. 2011). This case referred to the Joint Statement with no discussion of its persuasive authority and merely restated its brief conclusion. *Id.* at 1040. The Joint Statement was not necessary to the matter before that court, which was whether a landlord must treat those with assistance animals for mental disabilities (who were charged a fee) the same as those with assistance animals for physical

disabilities (for whom the fee was waived). *Id.* at 1039, 1032 (emphasis added). Ultimately, the court found that there was an outstanding "fact[ual] question regarding whether the requested accommodation [was] necessary to afford equal opportunity to use and enjoy" the apartment. *Id.* at 1039. That case is distinguishable from this one because some disabled individuals were treated differently from others, whereas all individuals are treated the same here under the generally applicable animal fee.

Plaintiff cites to another case for her case-in-chief and to demonstrate that courts regularly cite to the Joint Statement's guidance related to animal fees, *Intermountain Fair Hous. Council v. CVE Falls Park, L.L.C.*, No. 2:10-CV-00346-BLW, 2011 WL 2945824 (D. Idaho July 20, 2011). This case is similarly unpersuasive. That court likewise quoted the Joint Statement as if it were binding, *id.* at *5, and then improperly cited to *Chevron* to describe the deference a court should give to the Joint Statement, *id.* at *6. Interpretations like joint statements and notices are given *Skidmore* deference. *See Christensen*, 529 U.S. at 587; *see also Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1286 (11th Cir. 2014) (noting that the Joint Statement receives *Skidmore* deference, not *Chevron*-style deference). Additionally, the U.S. Supreme Court overruled *Chevron* and "eliminated the 'judicial invention' of deference to administrative action and rulemaking" in *Loper Bright v. Raimondo*. *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 562 (5th Cir. 2024). Therefore, the deference afforded to the Joint Statement in *Intermountain Fair Housing Council* is improper to afford today. The Court is not swayed by these two district court cases, which contain no analysis of the Joint Statement's claims and no reasoning or determination as to its power to persuade.

Therefore, the Notice's interpretations do not contain the power to persuade and do not alter the Court's necessity or reasonableness analysis. Accommodations related to generally applicable fees must be analyzed in a "fact-specific,...case-by-case determination." *California Mobile Home Park Mgmt. Co.*, 29 F.3d at 1418. To be clear, the Court is not holding that animal fees can always be enforced against someone with an ESA, or even that this animal fee can be enforced against every resident. The Court holds that plaintiff here failed to establish a genuine issue of material fact as to whether the waiver of the fee was necessary and reasonable. Because plaintiff's claims fail on the necessity and the reasonableness prongs, the Court grants summary judgment on plaintiff's reasonable accommodations claims under the FHA and LEHOA.

**B. Defendants' Breach of Contract Claims**

Under 28 U.S.C. § 1367(c)(3), when federal-law claims that serve as the basis of subject matter jurisdiction are dismissed, and only state-law claims based on supplemental jurisdiction remain, a district court has broad discretion to decline jurisdiction over the remaining claims. *See Brown v. Sw. Bell Tel. Co.*, 901 F.2d 1250, 1254 (5th Cir. 1990) ("[W]hen there is a subsequent narrowing of the issues such that the federal claims are eliminated and only pendent state claims remain, federal jurisdiction is not extinguished, [and] the decision as to whether to retain the pendent claims lies within the sound discretion of the district court."). In deciding whether to hear any remaining state-law claims, courts are to "analyze the statutory and common law factors that are relevant to the question of its jurisdiction over pendent state law claims." *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 158-59 (5th Cir. 2011). The relevant statutory factors are those found in Section 1367, including "(1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4) whether there are exceptional circumstances or other compelling reasons for declining jurisdiction." *Id.* (citing 28 U.S.C. § 1367(c)). The common law factors include comity, convenience, fairness, and judicial economy. *See Parker & Parsley Petroleum v. Dresser Ind.*, 972 F.2d 580, 585 (5th Cir.1992). The "general rule" is for courts to decline to exercise jurisdiction over remaining state-law claims when all federal claims have been dismissed prior to trial. *Smith v. Amedisys Inc.*, 298 F.3d 434, 446-47 (5th Cir. 2002).

***7** As to the first statutory factor, the state-law claims do not raise unresolved issues of Louisiana law—the primary dispute is an issue of fact. Therefore, that factor disfavors dismissal. But the other three statutory factors favor dismissal because no federal claims remain, and there are no exceptional circumstances here.

On balance, the common-law factors favor dismissal as well. The common-law factor of comity "demands that the 'important interests of federalism and comity' be respected by federal courts, which are courts of limited jurisdiction and 'not as well equipped for determinations of state law as are state courts.' " *Enochs*, 641 F.3d at 160 (quoting *Parker & Parsley Petroleum*

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Co. v. Dresser Indus.*, 972 F.2d 580, 587 (5th Cir. 1992)). Given that only a state-law claim remains in this case, the adjudication of which would require grappling exclusively with Louisiana law, the factor of comity weighs in favor of dismissal.

The convenience factor also favors dismissal. The state court that would likely hear this matter would be the 24th Judicial District Court in Jefferson Parish. It is a more convenient forum than the United States District Court for the Eastern District of Louisiana in Orleans Parish. The underlying events occurred in Jefferson Parish, and most of the witnesses are located there. *See Enochs*, 641 F.3d at 160 ("[I]t is certainly more convenient for the case to have been heard in the Texas state court...where all of the parties, witnesses, and evidence were located."). Accordingly, the convenience factor favors declining jurisdiction.

As to fairness, the Court can identify no reason why a state court would be unlikely to fairly resolve the remaining claim. And, although trial is scheduled for October, courts routinely remand cases nearer to the trial date when all federal claims have been dismissed. *See, e.g., Total Ben. Servs., Inc. v. Grp. Ins. Admin., Inc.*, 875 F. Supp. 1228, 1242 (E.D. La. 1995) (dismissing state law claims when trial was a couple weeks away).

The judicial economy factor is less straightforward. This case commenced over a year ago, with defendants filing the counterclaim in June 2024. Requiring defendants to re-file their claim in state court when trial is scheduled in a few months is certainly a hardship. But by the same token, only minimal adjudication of this matter has occurred. This is the first time the Court considered case-dispositive motions, and the Court has not yet considered the merits of defendants' state-law claim, which can be readily handled by a state court. On balance, the Court finds that this factor is neutral.

Three of the four statutory factors weigh in favor of declining to exercise pendent jurisdiction, and, on balance, the common-law factors favor declining jurisdiction. The Court thus finds no reason to depart from the "general rule" that federal courts should decline to exercise jurisdiction over the remaining state-law claim when all federal claims have been dismissed prior to trial. *Smith*, 298 F.3d at 446–47; *cf. Newport Ltd. v. Sears, Roebuck & Co.*, 941 F.2d 302, 307–08 (5th Cir. 1991) (holding that a district court abused its discretion after it dismissed a case on the eve of trial after it had been litigated for four years, consuming hundreds of court hours and producing twenty-three volumes and thousands of pages of record consisting of over 100 depositions, 200,000 pages of discovery, and a pretrial order exceeding 200 pages). The Court dismisses defendants' state-law claims without prejudice.

**IV. CONCLUSION**

***8** For the foregoing reasons, the Court GRANTS defendants' motions for summary judgment on plaintiff's Fair Housing Act and the Louisiana Equal Housing Opportunity Act claims and DISMISSES WITH PREJUDICE plaintiff's 42 U.S.C. § 3604(f)(3)(B) and La. Rev. Stat. § 51:2606(A)(6)(a)(ii) claims. The Court DISMISSES WITHOUT PREJUDICE defendants' state-law claims.

**All Citations**

Slip Copy, 2025 WL 1951763

**Footnotes**

1 R. Docs. 69 & 36.

2 R. Docs. 69.

# Exhibit B

Docusign Envelope ID: 926C6953-9513-42B4-A32D-46988B52FECB

# Determination of No Reasonable Cause

**CASE NAME:** [redacted]

**CASE NUMBER:** 08-24-7654-8

## I. JURISDICTION

Complainants [redacted] allege that Respondents [redacted] (Respondent Owner), as the owner of the Subject Property known as [redacted] acting by and through its agents and/or employees, [redacted], doing business as [redacted] (Respondent Property Manager), and Respondent [redacted] (Respondent Pet Screener), allegedly discriminated against Complainants in the terms and conditions based on disability and by refusing to make a reasonable accommodation for Complainant [redacted].

The allegations could constitute violations of Sections 804(f)(2) and 804(f)(3)(B) of the Fair Housing Act. The most recent act of discrimination is alleged to have occurred on February 23, 2024, and is continuing. The inquiry with FHEO was made on February 21, 2024, and the complaint was filed on March 25, 2024.

## II. COMPLAINANT'S ALLEGATIONS

Following is a summary of Complainants' allegations.

Complainants are domestic partners who reside together at [redacted]. Complainant [redacted] is a disabled individual, as defined by the Act. Complainant [redacted] requires the presence of three emotional support animals (ESAs), a dog and two cats, to alleviate the symptoms associated with her disabilities. Complainant [redacted] has been discriminated against based on his association with Complainant [redacted].

Respondent Owner and Respondent  Property Manager assess pet fees and deposits at the Subject Property.

On February 20, 2024, they asked Respondents to waive the pet fees and deposits for Complainant [redacted]'s ESAs as a disability-related reasonable accommodation by completing an online application at Respondent Pet Screener's website. Complainants state they also provided third- party verification supporting Complainant [redacted]'s disability-related need to live with her three ESAs.

Complainants allege that on February 20, 2024, Respondent Pet Screener denied the requested accommodation by email, citing unreliable documentation. Complainants allege that on February 23, 2024, Respondent Pet Screener requested information from Complainant [redacted]'s health care provider beyond what is necessary under the Act to consider the requested accommodation.

## III. RESPONDENT'S DEFENSES

On June 28, 2024, Respondent Pet Screener submitted a response to the allegations. Following is a summary of Respondent's defenses to the allegations.

Complainant [redacted] moved into the Subject Property in June 2023 and reported to property management that they did not have any animals. On February 7, 2024, Respondents implemented Respondent Pet Screener's screening system to store and review animal-related requests. Four days later, Complainant [redacted] submitted applications for three emotional support animals, which according to Respondents' records had never before been reported. The applications lacked any documentation.

One week later, Complainant [redacted] uploaded a letter from February 23, 2023, describing the dog and two cats as emotional support animals. The letter was an identical match to ESA letters purchased from esadoctors.com. Another resident at the Subject Property submitted an identical letter from the healthcare professional who had signed Complainant [redacted]'s letter. That resident had admitted the letter was purchased from esadoctors.com.

Respondent made Complainant [redacted] "aware of the HUD 2020 guidelines which state that purchasing ESA documentation by utilizing a website that advertises such documentation for sale and will provide a letter after a questionnaire and/or short interview, is not considered reliable documentation by itself. [Respondent] asked [Complainant] [redacted] if she had documentation from a healthcare provider who was familiar with her disability, who could confirm she has a disability-related need for each of her animals."

Respondent asked both Complainant [redacted] and the healthcare provider to answer two questions as to whether Complainant "used a website advertising ESA letters/evaluations for sale" and whether the Complainant received "an ESA letter after completing a questionnaire and/or participating in a short interview/evaluation and paying a fee."

On or around March 12, 2024, without having received responses to those questions, Respondents determined that the three animals would be considered pets until new documentation was provided. "At no time were the complainants asked to remove any animals from the Subject Property."

To verify the source of the ESA letter, Respondent Pet Screener then "made a purchase through esadoctors.com," and were sent an ESA letter by the same healthcare professional on which Complainant [redacted] relied that is identical to the letter Complainant [redacted] submitted to Respondents, including the necessity of precisely three ESAs.

Complainant's ESA letter "was 100% … purchased from esadoctors.com." Based on HUD's 2020 ESA notice, the documentation provided was not enough to establish that Complainant [redacted] had a non-observable disability-related need for an assistance animal.

## IV. FINDINGS AND CONCLUSIONS

**Alleged Violations of Section 804(f)(3)(B): Failure to Make a Reasonable Accommodation**

Under Section 804(f)(3)(B) of the Act, it is unlawful to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

To establish a failure to make a reasonable accommodation, the following elements must be met:

[1] An individual with a *disability requests* an accommodation,
[2] and Respondent *refuses* to make
[3] a *reasonable accommodation* in rules, policies, practices, or services,
[4] when the accommodation is
 [a] *necessary* to afford such person
 [b] *equal opportunity* to use and enjoy a dwelling.

Respondents provided documentation corroborating their response and defenses. Complainants lived on the Subject Property for eight months before disclosing the non-service animals—a dog and two cats—housed within the unit. Complainant [redacted] does not have a readily observable disability. Respondent asked for documentation to assess the emotional support animal requests. Complainants eventually provided a boilerplate ESA letter stating that precisely one dog and two cats were necessary. The letter was obtained from an online source that sold ESA letters.

After receiving the ESA letters, Respondents asked follow-up questions to determine the reliability of the ESA letters, which Respondents believed to be purchased online. Neither the Complainants nor the healthcare provider responsively answered the follow-up questions, by writing or verbally. Respondent Pet Screener then ran a test to determine whether the ESA letter provider would produce the same letter for any paying customer that completed the questionnaire. The test produced a materially identical letter for three emotional support animals.

Having received only a boilerplate recommendation purchased online, which inherently lacks reliability, Respondents continued to treat the dog and two cats as pets and assess a generally applicable pet fee. Thus, the record provides no reasonable cause to believe that Respondents refused to make a reasonable accommodation.

Additionally, the record indicates that Respondents never demanded the removal of the animals from the Subject Property. The policy at issue in this case is the assessment of pet fees for untrained emotional support animals. Complainants do not allege, and the record provides no indication, that the waiver of pet fees for the untrained animals was necessary to afford Complainants an equal opportunity to use and enjoy the dwelling.

**Alleged Violation of Section 804(f)(2): Discriminatory Terms, Conditions, or Privileges on the Basis of Disability**

Under Section 804(f)(2)(A), (f)(2)(C) of the Act, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" that person's disability or the disability of any person associated with that person.

The only discriminatory condition alleged is the assessment of a generally applicable pet fee. As outlined in the preceding section, the record provides no reasonable cause to believe Respondents violated Section 804(f)(2) by imposing discriminatory terms on Complainant with respect to the assessment of the pet fee.

**Conclusion**

The Department finds no reasonable cause to believe a violation of Sections 804(f)(2) or Sections 804(f)(3)(B) of the Fair Housing Act has occurred as alleged in the complaint.

## V. ADDITIONAL INFORMATION

This determination only addresses the violations of the Act alleged in the complaint and during the investigation and does not address any potential violations of any other provision of law. A determination of no reasonable cause is limited to the facts developed in a specific investigation and is not a determination of compliance with the requirements of the Act.

HUD's Final Investigative Report (FIR) will be made available upon request to the parties, pursuant to 24 C.F.R. § 8.56(g)(3). Requests may be directed via email to: [redacted] or via mail to:

[redacted]

On behalf of the Department of Housing and Urban Development:

[redacted]

04/14/2026
Date

# Exhibit C

# Determination of No Reasonable Cause

**CASE NAME:** [redacted]

**CASE NUMBER:** 10-24-2930-8

## I. JURISDICTION

Complainant [redacted] alleges that [redacted] (Respondent Owner), as the owner of the Subject Property at [redacted], acting by and through its agents and/or employees, [redacted] (Respondent Property Manager), discriminated against Complainant in the terms and conditions based on her disability, refused to make a reasonable accommodation, and retaliated against her in violation of the Fair Housing Act, as amended (the Act).

The allegations could constitute violations of Sections 804(f)(2), 804(f)(3)(B), 818 of the Act. The most recent act of discrimination is alleged to have occurred on September 12, 2023. The inquiry with FHEO was timely made on March 21, 2024, and the complaint was filed on March 10, 2025.

## II. COMPLAINANT'S ALLEGATIONS

Following is a summary of Complainant's allegations.

Complainant has a mental disability and requires emotional support animals. The Subject Property is owned by [redacted] and managed by [redacted]. The Complainant submitted to Respondents a reasonable accommodation request for emotional support animals, including three dogs, a bird, and a snake. One emotional support dog was approved on June 26, 2023. On July 12, 2023, the other animals were approved as emotional support animals. After the emotional support animals were approved, Respondents continued charging Complainant a double pet fee of $50 a month.

On August 30, 2023, Complainant's unit failed an inspection by the City of Gresham.
On September 12, 2023, the City of Gresham informed Respondents and Complainant that the Complainant's unit violated the City's maintenance and development codes. The City directed Respondents to make the necessary repairs to bring the dwelling into compliance. Respondent Property Manager refused to fix the issues with the unit.

Respondents imposed discriminatory terms and conditions by charging pet fees for her emotional support animals, thereby constructively denying her reasonable accommodation request.

Because of Complainant's requests for animals to be recognized as emotional support animals, Respondents retaliated against Complainant by failing to fix Complainant's unit.

Because Complainant was a victim of discrimination based on her disability, she moved out of the unit.

## III. RESPONDENT'S DEFENSES

On March 31, 2025, Respondent Property Manager submitted the following responses to the allegations.

Respondent admits to managing the Subject Property but denies all allegations of discrimination and asks for dismissal of the complaint.

First, Respondent asserts that "the claim(s) raised by [redacted] in the instant complaint were already settled and released as the result of civil litigation between the very same parties, same Subject Property located at [redacted], and same discrimination and reasonable accommodation claims."

On the merits, Complainant committed more than 20 violations during her tenancy, and on November 27, 2023, Respondent Property Manager initiated eviction proceedings for non-payment of rent. Complainant housed a variety of animals at different times during her tenancy, which made it very difficult to ascertain what types of animals she had at the Subject Property at any given time, whether she had submitted requests for each to be designated as support animals, and whether the requests had been approved.

Within the span of a few months in 2023, Complainant housed the following animals at the Subject Property: a Chihuahua, a Rottweiler, a Pit Bull, a snake, a bird, a bunny, 8 puppies, and a cat. Respondent charged pet rent because at most, if not all times, Complainant housed animals that had not been approved as support animals. In her original lease, Complainant listed the Chihuahua as a pet, which initiated the $25 pet rent. On July 27, 2023, the Chihuahua was approved as a support animal. Subsequently, Complainant then housed 8 puppies and a cat – none of which were approved as support animals. Pet rent was justified for these additional animals.

Respondent Property Manager credited Complainant in the amount of $225 for pet fees despite her housing several unauthorized pets during her tenancy. Complainant routinely housed unauthorized animals at the Subject Property and would only seek approval for "support animal" status when Respondent Property Manager notified her that they were considered unauthorized pets.

Complainant's eviction was predicated solely upon her failure to pay rent.

Additionally, Respondent Owner provided the following responses to the allegations during the course of the investigation. Respondent Owner admits to owning the Subject Property but denies all allegations of discrimination.

Complainant lied about maintenance requests being ignored, as maintenance was performed on the unit. After the repairs, the city inspector certified that the unit met city standards.

Complainant failed to pay rent for the Subject Property for multiple months, which triggered the eviction action.

Respondent Owner spent approximately $20,000 over seven to eight months to repair and rehabilitate the Subject Property for re-rental after Complainant vacated it. Complainant left approximately 3,000 pounds of garbage throughout the Subject Property and caused substantial damage.

Respondent Owner told Complainant that she loves animals. Respondent Owner, however, outsourced the particulars of the "animal information" to Respondent Property Manager, and Respondent Owner would be unable to provide particulars on the animals housed at the Subject Property.

## IV. FINDINGS AND CONCLUSIONS

Without deciding whether the binding civil settlement should have barred the Department from investigating the complaint, the complaint is due to be dismissed on the merits.

**Alleged Violations of Section 804(f)(3)(B): Failure to Make a Reasonable Accommodation**

Under Section 804(f)(3)(B) of the Act, it is unlawful to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

To establish a failure to make a reasonable accommodation, the following elements must be met:

[1] An individual with a *disability requests* an accommodation,
[2] and Respondent *refuses* to make
[3] a *reasonable accommodation* in rules, policies, practices, or services,
[4] when the accommodation is
    [a] *necessary* to afford such person
    [b] *equal opportunity* to use and enjoy a dwelling.

The record establishes that Complainant lived on the Subject Property and housed several animals, including more than three dogs, a cat, a bird, and a snake. Complainant does not have a readily observable disability, and none of the animals were service animals. Respondent asked for documentation to assess the emotional support animal requests. The record shows Complainant's requests to designate four animals as emotional support animals were approved. The record shows, however, that a cat was housed on the Subject Property and that Complainant had not submitted as an emotional support animal request.

The requested accommodation was the waiver of all pet fees for the untrained alleged emotional support animals. Respondents could not provide accommodations for support animals that were never requested, and it would not have been reasonable for Respondents to assume any and all animals housed with Complainant provided necessary emotional support. Moreover, Complainants presented evidence that they refunded pet fees.

Complainant does not allege, and the record provides no indication, that it was necessary for Respondents to waive pet fees for all of Complainants' untrained alleged emotional support animals to afford Complainant an equal opportunity to use and enjoy the dwelling.

No reasonable cause exists to believe Respondents failed to provide a reasonable accommodation.

**Alleged Violation of Section 804(f)(2): Discriminatory Terms, Conditions, or Privileges on the Basis of Disability**

Under Section 804(f)(2)(A)-(C) of the Act, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" that person's disability or the disability of any person associated with that person.

The only discriminatory condition alleged is the assessment of a generally applicable pet fee. As outlined in the previous section, the record provides no reasonable cause to believe Respondents violated Section 804(f)(2) by imposing discriminatory terms on Complainant with respect to the assessment of the pet fee.

**Alleged Violation of Section 818: Interference, coercion, or intimidation**

Under Section 818 of the Act, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right" under the Act.

To establish a retaliation claim, the following elements must be met:

[1] a person engaged in a protected activity
[2] that person suffered adverse actions
[3] the adverse action was causally related to the protected activity.

Complainant alleges that Respondent Property Manager refused to make necessary repairs to Complainant's unit due to Complainants' requests for animal-related reasonable accommodations. Requesting a reasonable accommodation is a protected activity.

The evidence shows that Respondents undertook repair efforts after some animals were submitted (and approved) as emotional support animals. Respondents submitted documentation from the City establishing that the dwelling subsequently passed inspection. Respondent Property Manager refunded $225 in pet fees. The eviction action was initiated due to nonpayment of rent.

The record indicates that the Complainant did not suffer adverse action that was causally related to the reasonable accommodation requests. No reasonable cause exists to believe Respondents retaliated against Complainant for requesting waiver of pet fees for her emotional support animals.

**Conclusion**

The Department finds no reasonable cause to believe a violation of Sections 804(f)(2), 804(f)(3)(B), or 818 of the Fair Housing Act has occurred as alleged in the complaint.

## V. ADDITIONAL INFORMATION

This determination only addresses the violations of the Act alleged in the complaint and during the investigation and does not address any potential violations of any other provision of law. A determination of no reasonable cause is limited to the facts developed in a specific investigation and is not a determination of compliance with the requirements of the Act.

HUD's Final Investigative Report (FIR) will be made available upon request to the parties, pursuant to 24 C.F.R. § 8.56(g)(3). Requests may be directed via email to: [redacted] or via mail to:

[redacted]

On behalf of the Department of Housing and Urban Development:

[redacted]

04/14/2026
Date